## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  **v.**                                                  **Case No. 17-CR-22**

**TERRY RICHARDSON**
        **Defendant.**

---

### DECISION AND ORDER

Defendant Terry Richardson moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). For the reasons that follow, I deny his motion.

### I. FACTS AND BACKGROUND

Defendant committed two armed robberies of the same liquor store in Milwaukee, Wisconsin. During the first, which occurred on December 6, 2016, he entered the store and attempted to make a liquor purchase. The cashier asked for ID and defendant stated he would return with his identification. (PSR ¶ 8.) About five minutes later, defendant came back, approached the cash register, and produced a black semiautomatic firearm from his jacket pocket, which he pointed at the cashier, who handed defendant the register drawer (PSR ¶ 9), which contained about $300 (PSR ¶ 10).

On January 3, 2017, defendant entered the liquor store armed with a grey handgun. He said "gimme" three times while pointing the firearm at the cashier, who, upon seeing the gun, began to back up behind the service counter. In response, defendant fired the gun at the cashier, who continued to back up and begged defendant not to hurt him. Defendant continued to say "gimme," and the cashier moved back towards the register, removed the drawer, and put

it on the counter. As the cashier attempted to comply, defendant fired another shot at him; the cashier jumped out of the way, and the bullet shattered bottles displayed on the wall directly behind the cashier. Defendant then grabbed the drawer and ran out. (PSR ¶ 11.) The cashier estimated that approximately $400 was taken from the store on this occasion. (PSR ¶ 13.)

The police caught defendant when he returned to pick up his cell phone, which he had dropped outside the store. (PSR ¶ 15-16.) On searching his vehicle, police recovered a .45 caliber handgun. (PSR ¶ 16.) In a post-arrest confession, defendant indicated that he drank two bottles of brandy prior to the robbery. He admitted pointing the gun at the clerk and stated that it went off "accidentally," "possibly two times." He further admitted that he had robbed the same location several weeks earlier in the same manner, except he did not shoot his gun at that time. (PSR ¶ 17.)

Pursuant to an agreement with the government, defendant pleaded guilty to two counts of Hobbs Act Robbery, 18 U.S.C. § 1951, and one count of brandishing a firearm in relation to the December 2016 robbery, 18 U.S.C. § 924(c). (R. 16, 18.)[1] During the pre-sentence interview, defendant advised that he felt remorseful and sorry for his victims, who were likely in fear for their lives; he explained that he had been robbed and knew how it felt. (PSR ¶ 22.) He further explained that, due to his health issues,[2] he had stopped working and stayed with

---

[1]The government agreed to dismiss a § 924(c) "discharge" count related to the January 2017 robbery, saving defendant a mandatory 10-year consecutive term.

[2]The PSR indicated that defendant suffered from gastritis and severe migraines. Defendant reported that he once passed out while at work due to gastritis and was taken to the hospital, where he stayed for one day in 2013. He reported that since that time he experienced constant pain and bloating. (PSR ¶ 83.) He also reported seeing a neurologist regarding his headaches in 2013, but he had not been prescribed any medications for this condition. (PSR ¶ 84.) He reported no additional history of chronic illnesses and/or medical conditions requiring treatment. (PSR ¶ 85.)

2

his child while his girlfriend worked. Yet, he struggled adjusting to the fact that he was not providing for the family. He tried to obtain employment without success. He started drinking and abusing pain medication. When drunk, he would black out and do stupid thing such as this. (PSR ¶ 24.) Defendant had a limited prior record consisting of three municipal court matters (marijuana possession and two resisting/obstructing violations); these were his first criminal convictions. (PSR ¶¶ 57-60.)

The sentencing guidelines called for 63-78 months' imprisonment on robbery counts and 84 months consecutive on the firearm count (PSR ¶ 113), but the parties jointly recommended a total sentence of 108 months (R. 16 at 8 ¶ 21). At defendant's November 27, 2017, sentencing hearing, I followed the joint recommendation. These were very serious offenses, particularly the second robbery, in which the victim-cashier could have been seriously injured or killed. However, I accepted that defendant was highly intoxicated and probably did not intend to hurt anyone. Nor did he obtain very much money during either robbery. Under these circumstances, a 108-month sentence provided a sufficient measure of punishment. This term also sufficed to protect the public, given defendant's minimal prior record, and to deter, given the fact that he had never served time before. I therefore committed defendant to the custody of the Bureau of Prisons for 24 months on the robbery counts, running concurrently with each other, and 84 months on the § 924(c) count, running consecutively, for a total of 108 months. (R. 24, 25.)

On April 13, 2020, defendant filed a pro se motion seeking compassionate release. (R. 27.) I referred the matter to Federal Defender Services ("FDS"), pursuant to the court's standing order regarding First Step Act motions (R. 28), but FDS declined to supplement the pro se submission (R. 29). I then directed the government to respond (R. 30), and on May 1,

3

2020, the government filed a response opposing the motion based on defendant's failure to exhaust administrative remedies (R. 31). On May 8, 2020, defendant filed a request to appoint counsel (R. 33), and on May 18, 2020, he filed a copy of an administrative request for release he made to the warden (R. 34). On August 28, 2020, defendant filed a brief with attachments in support of his motion (R. 35), and on September 14, 2020, I directed the government to file an additional response (R. 36), which it did on September 21, 2020, agreeing that defendant had exhausted but opposing release on the merits (R. 38). I afforded defendant until October 6, 2020, to file a reply (R. 39), but he has not done so.

According to the BOP's website, defendant is currently serving his sentence at USP Yazoo City, with a projected release date of October 14, 2024. At the time of his previous filings, defendant was housed at FCI Elkton. (R. 27 at 2; R. 36 at 16.) He has not updated the court with his new address or otherwise requested additional time to reply.

## II. DISCUSSION

### A. Compassionate Release Standards

Section 3582(c)(1)(A) authorizes the district court to grant what is commonly known as "compassionate release." The statute provides, in pertinent part:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction . . .

4

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i). As courts have noted, the statute contains three requirements: (1) the defendant must first make a request to the warden before applying to the court; (2) the defendant must then demonstrate to the court that "extraordinary and compelling reasons" warrant a reduction in his sentence; and (3) the court must determine whether, even if such reasons are shown, a reduction of the sentence would be inconsistent with the applicable 18 U.S.C. § 3553(a) factors. E.g., United States v. Cole, No. 08-CR-327, 2021 U.S. Dist. LEXIS 2404, at *5 (E.D. Wis. Jan. 7, 2021).

### 1. Exhaustion

Before 2018, compassionate release required a motion from the BOP. United States v. Sanford, 986 F.3d 779, 781 (7th Cir. 2021). However, the First Step Act of 2018 amended the compassionate release statute to permit the court to adjudicate a motion directly from the defendant—provided, however, that the defendant must first present his request for compassionate release to the warden and exhaust administrative appeals (if the request is denied) or wait 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. Id. at 781-82. The Seventh Circuit has held that, while this "exhaustion" requirement is not jurisdictional, it is a mandatory claim-processing rule which must be enforced if raised by the government. Id. at 782; see also United States v. Williams, 987 F3d 700, 703 (7th Cir. 2021) (holding that "an inmate is required to present the same or similar ground for compassionate release in a request to the Bureau as in a motion to the court").

## 2. Extraordinary and Compelling Reasons

The statute does not define the term "extraordinary and compelling reasons." Rather, Congress instructed the Sentencing Commission, in promulgating general policy statements regarding the sentence modification provisions in § 3582(c)(1)(A), to describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. See 28 U.S.C. § 994(t).[3] The Commission's policy statement provides:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1) (A) extraordinary and compelling reasons warrant the reduction . . .
>
> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
> (3) the reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13. The commentary to the policy statement indicates that extraordinary and compelling reasons exist under these circumstances:

> (A) Medical Condition of the Defendant.—
>
> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life

---

[3] Congress did state that: "Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Id. Courts have held that "while rehabilitative efforts alone will not support compassionate release, the court may take such efforts into account as part of the analysis." United States v. Anderson, No. 14-CR-186, 2020 U.S. Dist. LEXIS 187983, at *13 (E.D. Wis. Oct. 8, 2020); see also United States v. Hudson, 967 F.3d 605, 613 (7th Cir. 2020) (noting that the court may in deciding a First Step Act motion consider the defendant's post-sentencing conduct as part of the § 3553(a) analysis).

6

> > expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> > (ii) The defendant is—
>
> > > (I) suffering from a serious physical or medical condition,
>
> > > (II) suffering from a serious functional or cognitive impairment, or
>
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
> > (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> > (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

U.S.S.G. § 1B1.13 cmt. n.1.

The Commission has not updated the policy statement, which purports to require a motion from the director of the Bureau of Prisons, see U.S.S.G. § 1B1.13 cmt. n.4, since the passage of the First Step Act, which allowed defendants to bring their own motions. Accordingly, "because the Guidelines Manual lacks an applicable policy statement, the trailing

7

paragraph of §3582(c)(1)(A) does not curtail a district judge's discretion." United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020); see also United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020) ("[T]he First Step Act freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them in motions for compassionate release. Neither Application Note 1(D), nor anything else in the now-outdated version of Guideline § 1B1.13, limits the district court's discretion.").

Giving the statutory terms their common meaning, a defendant seeking compassionate release must demonstrate that his situation is extraordinary, i.e., beyond what is usual, customary, or regular, and his need for release compelling, i.e., irreparable harm or injustice will result if relief is not granted. United States v. Scott, 461 F. Supp. 3d 851, 862 (E.D. Wis. 2020); see also Gunn, 980 F.3d at 1180 (noting that the Commission's analysis can guide discretion without being conclusive). In the context of the COVID-19 pandemic, courts have found that modification may be warranted if the prisoner demonstrates that he is particularly vulnerable to the virus based on his age, health status, or other specific circumstances; courts have tended to deny compassionate release requests based on general concerns about possible exposure in prison. E.g., United States v. Dover, No. 14-CR-196, 2020 U.S. Dist. LEXIS 133340, at *16-17 (E.D. Wis. July 28, 2020); see also United States v. Thomas, No. 1:11-CR-22, 2020 U.S. Dist. LEXIS 172963, at *6-7 (N.D. Ind. Sept. 22, 2020) (explaining that § 3582(c)(1)(A) contemplates a sentence reduction based on the particular circumstances of where the defendant is housed and his personal health conditions). Courts often rely on the guidance provided by the CDC in evaluating the medical conditions alleged to increase a prisoner's risk during the pandemic. E.g., United States v. Villasenor, No. 03 CR 0689 (-02), 2020 U.S. Dist. LEXIS 228055, at *15 (N.D. Ill. Dec. 4, 2020).

8

### 3. Section 3553(a) Factors

Finally, if the court decides that extraordinary and compelling reasons have been shown, it must also consider the applicable § 3553(a) factors to determine whether the sentence should be modified. See United States v. Saunders, 986 F.3d 1076, 1078 (7th Cir. 2021) ("Because of the importance of the § 3553(a) factors, courts are not compelled to release every prisoner with extraordinary and compelling health concerns."). Those factors include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for the sentence imposed to provide just punishment, deterrence, protection of the public, and correctional treatment; (3) the kinds of sentences available; (4) the sentencing guideline range; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to the victims of the offense. 18 U.S.C. § 3553(a). In some cases, a court may find that the relevant § 3553(a) factors outweigh the extraordinary and compelling reasons warranting compassionate release and/or that release would undermine the goals of the original sentence. United States v. Bartlett, No. 06-CR-273, 2020 U.S. Dist. LEXIS 101393, at *13-14 (E.D. Wis. June 9, 2020).

## B. Defendant's Motion

### 1. Exhaustion

In his original motion, defendant acknowledged that he had not exhausted his BOP remedies. (R. 27 at 2.) In its initial response, the government raised the failure to exhaust as a bar to relief.[4] (R. 31 at 2-10.) However, defendant subsequently filed a copy of the warden's

---

[4] The government also stated that defendant's medical condition of gastritis did not make him more vulnerable to COVID-19. (R. 31 at 9.)

9

response to his administrative request for compassionate release (R. 34 at 2; see also R. 35 at 6), and the government now agrees that defendant had satisfied the exhaustion requirement (R. 38 at 5). I will accordingly address the merits.

**2.     Extraordinary and Compelling Reasons**

In his original motion, defendant sought release based on a COVID-19 outbreak at FCI Elkton, where he was then housed. (R. 27 at 2.) He further noted that he had been diagnosed with a chronic acid reflux disease called gastritis, which constantly aggravated his stomach and caused unbearable pain. (R. 27 at 2.) He claimed that if he contracted COVID-19 there was a high likelihood he may not recover and argued that the longer he remained at FCI Elkton the greater his chances of contracting a death sentence. (R. 27 at 2.)

In his supporting brief, defendant indicated that in April 2020 he began experiencing fever, shortness of breath, cough, and chest tightness, as well as stomach pain. (R. 35 at 2-3.) He indicated that on May 15, 2020, he tested negative for COVID-19, despite having symptoms associated with the disease. He was nevertheless placed in isolation and continued to experienced symptoms. On May 25, 2020, he reported loss of taste and smell, and body aches, and after medical evaluation he was sent back to isolation. (R. 35 at 3.) He continued to experience symptoms in June and July, although he again tested negative on July 16, 2020. (R. 35 at 4.) He argued that his medical complaints were being ignored (R. 35 at 4), and that he had been bounced around from isolation units to regular housing (R. 35 at 6). He stated that as of his last medical evaluation on July 16, 2020, he continued to complain of coughing and shortness of breath. (R. 35 at 7.) He stated that he suffers from underlying conditions such as gastritis, bronchitis, and asthma, which will subject him to more serious health problems in the future. (R. 35 at 7.) He noted that courts had granted release to inmates with

10

underlying chronic medical problems who were facing dire prison conditions. (R. 35 at 8.) He argued that he suffered from underlying conditions, and he still experienced symptoms such as shortness of breath, cough, body aches, and headaches. (R. 35 at 9.) Finally, defendant noted that FCI Elkton was one of the hardest hit prisons in the federal system, and the situation was still not under control as of August 2020 (R. 35 at 9-10, 12), citing various cases discussing conditions there (R. 35 at 11, 12-13). Defendant further discussed in the supplemental brief the BOP's expanded authority to transfer inmates to home confinement (R. 35 at 4-5), and noted that FCI Elkton had been identified by the Attorney General as a facility where the BOP should maximize such transfers (R. 35 at 5, 11). He concluded that conditions at this facility violated the Eighth Amendment. (R. 35 at 12, 14-15.)

The medical records attached to defendant's brief document his complaints, but they do not substantiate his claims of severe medical problems. On April 8 and 13, 2020, defendant complained of shortness of breath, chest tightness, and low grade fever, but his vitals were stable and cardiac testing was negative. (R. 35-1 at 1-2.) Health services assessed a common cold. (R. 35-1 at 4.) On April 19, 2020, he complained of abdominal pain, as well as chest tightness (R. 35-1 at 6), but on exam health services assessed no significant findings/no apparent distress (R. 35-1 at 7). He was instructed to increase his fiber intake, resume exercise as tolerated, and avoid spicy foods. (R. 35-1 at 7.)

On April 23, 2020, defendant visited health services with complaints of cough and shortness of breath; the provider noted he "is campaigning for an albuterol inhaler. He does not have a dx of asthma." (R. 35-1 at 9.) His vitals were normal, and he was not wheezing or in distress. He stated he was taking over the counter Tylenol. (R. 35-1 at 9.) The provider noted that he had been seen several times over the past two weeks, an albuterol inhaler was

11

not indicated, and he was observed walking rapidly across the compound. (R. 35-1 at 9.) The provider assessed: "No Diagnosis." (R. 35-1 at 10.)

On April 25, 2020, defendant again complained of cough and sinus congestion, seeking an albuterol inhaler. (R. 35-1 at 12.) The provider again noted an unremarkable exam, with no indication for treatment with an albuterol inhaler. (R. 35-1 at 13.) On May 15, 2020, defendant produced a negative rapid test for COVID-19 (R. 35-1 at 14), but due to his symptoms, on May 19, 2020, a swab test was completed (R. 35-1 at 16).

On May 25, 2020, defendant continued to complain of cough and chest congestion/tightness, as well as other symptoms suggestive of COVID-19. (R. 35-1 at 17.) The provider noted that he walked easily to health services from isolation and was seen in "vibrant conversations as he walked the whole way down the sidewalk." (R. 35-1 at 18.) The provider suspected COVID-19 based on his reported symptoms; his test was pending. (R. 35-1 at 18.) The test came back negative on May 23, 2020. (R. 35-1 at 37.)

On June 11, 2020, defendant again complained of dry cough and dyspnea (R. 35-1 at 20), but his exam was largely unremarkable; the provider assessed common cold and suspected/probable COVID-19 (R. 35-1 at 21). He was given an inhaler at that time. (R. 35-1 at 21.) On June 15, 2020, defendant again complained of dry cough and dyspnea, but the assessment was the same. (R. 35-1 at 24.) The provider ordered a chest x-ray. (R. 35-1 at 24.)

On June 29, 2020, defendant was seen for complaint of abdominal pain; at that time, he denied chest pain or shortness of breath. (R. 35-1 at 27.) The provider assessed gastro-esophageal reflux disease without esophagitis, providing Mylanta. (R. 35-1 at 28.)

On July 16, 2020, defendant complained of chronic cough since the beginning of April.

12

The provider noted four negative chest x-rays since April 8, and exam that day was normal. He did not cough throughout the exam or while waiting in the back of medical to go to isolation. (R. 35-1 at 33.) The provider assessed a common cold. (R. 35-1 at 33.) Defendant submitted another negative rapid test for COVID-19 that day (R. 35-1 at 29, 31), and another test came back negative on July 17, 2020 (R. 35-1 at 39).

In its supplemental response, the government acknowledged the severe outbreak at FCI Elkton but noted that by that time (September 2020) only five inmates were noted to be positive. (R. 38 at 4.) The government further noted that, as indicated in its earlier response, gastritis does not render a person more susceptible to complications from COVID-19 (R. 38 at 6), and the medical records indicated that when defendant experienced symptoms he was able to obtain relief through medication and diet modification (R. 38 at 7). Moreover, the providers who treated defendant during the period at issue noted that he did not appear to be in distress, had normal vital signs, and displayed no difficulty walking or communicating. (R. 38 at 7.) While defendant believed something was wrong with him and alleged that prison staff were ignoring his complaints, the records showed that he was seen in health services numerous times, with essentially normal exams; he also received four chest x-rays (R. 38-1 at 98-103) and three COVID tests, all negative (R. 38-1 at 82). (R. 38 at 7-8.) The government concluded that defendant's medical records completely undermined his claims, and that he failed to satisfy his burden of demonstrating extraordinary and compelling reasons. (R. 38 at 8.)

The government also presented additional medical records for August and September 2020. On August 27, 2020, defendant was seen for a toothache. (R.38-1 at 88.) On September 2, 2020, he tested negative for COVID-19. (R. 38-1 at 4.) On September 14, 2020, he was seen in health services requesting a refill of the albuterol inhaler he had been given in

13

June. He stated that he had been coughing for seven months, but his assessment was unremarkable; he cleared his throat multiple times during the encounter, but no cough was noted. (R. 38-1 at 1.)

Defendant fails to establish extraordinary and compelling reasons for release. He is just 29 years old (PSR at 2) and suffers from no medical conditions increasing his risk of severe illness from COVID-19. The medical records document GERD/gastritis, but this condition has not been identified as one that increases the risk of severe COVID-19 symptoms. United States v. Johnson, No. 1:15-cr-00150-JPH-TAB-04, 2021 U.S. Dist. LEXIS 28393, at *9 (S.D. Ind. Feb. 16, 2021). Defendant references asthma and bronchitis, but the medical records document no such diagnosis. At one point, he reported a history of asthma and bronchitis (R. 35-1 at 7), but the provider stated: "He does not have a dx of asthma." (R. 35-1 at 9.) The records list his current and resolved diagnoses, including GERD, but neither asthma nor bronchitis is noted. (R. 38-1 at 80, 85.) Defendant alleges that he has experienced COVID-like symptoms, but all of his tests have been negative. The records also show that his complaints have not been ignored, his examinations have been unremarkable, and he has received appropriate treatment. At the time defendant filed his motion, FCI Elkton was experiencing a severe outbreak. However, defendant has since been transferred from this facility. USP Yazoo City reports just three prisoner and seven staff cases at this time.[5] Under these circumstances, defendant cannot establish extraordinary and compelling reasons for release due to the pandemic.

---

[5] https://www.bop.gov/coronavirus/ (last visited April 8, 2021).

### 3. Section 3553(a) Factors

In his papers, defendant says nothing about the § 3553(a) factors, his prison conduct, or his plans for the future. For the sake of completeness, I briefly discuss the factors, which weigh strongly against his claim. Defendant committed two armed robberies over a four week period, firing shots at the clerk from close range during the second offense. As the government notes, it is a miracle the clerk was not hit. The victim understandably reported being traumatized. (PSR ¶ 11.) Releasing defendant now, after he has served about ½ of his below-guideline sentence, would depreciate the seriousness of these crimes and fail to provide just punishment. See Saunders, 986 F.3d at 1978 (holding that district court permissibly considered time remaining on the sentence). While defendant lacked a prior criminal record, his commission of these two very serious offenses also suggests a need to protect the public. See 18 U.S.C. § 3553(a)(2)(C).

### 4. Appointment of Counsel

Defendant also filed a motion for appointment of counsel. (R. 33; see also R. 35 at 16.) As indicated above, I referred this matter to FDS pursuant to the court's administrative order, but FDS declined to represent defendant.

There is no right to counsel in a § 3582(c) proceeding, although the court may appoint counsel in the exercise of discretion. United States v. Johnson, 580 F.3d 567, 569 (7th Cir. 2009); United States v. Tidwell, 178 F.3d 946, 949 (7th Cir. 1999). Defendant fails to explain why appointment would be appropriate here. His filings demonstrate that he is able to gather the necessary evidence and adequately present his claims, with citation to appropriate authorities. Defendant contends that with counsel he is sure his motion will be granted (R. 33

at 1), but for the reasons stated above I find that his motion lacks merit.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion for compassionate release (R. 27) is denied.

**IT IS FURTHER ORDERED** that defendant's motion to appoint counsel (R. 33) is denied.

**FINALLY, IT IS ORDERED** that the government's motion to seal defendant's medical records (R. 37) is granted.

Dated at Milwaukee, Wisconsin, this 8th day of April, 2021.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge